UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

JEREMY JOHNSON,

                              Plaintiff;

-against-

SPIRIT AIRLINES, INC.,

                              Defendant.

Index No. 20-cv-3624

**COMPLAINT**

PLAINTIFF DEMANDS A
TRIAL BY JURY

Plaintiff, Jeremy Johnson, by and through his undersigned attorney, brings this action against the above-named Defendant, and Johnson alleges for his *Complaint* as follows:

## PARTIES

1.      Mr. Jeremy Johnson ("**Plaintiff**" or "**Johnson**") is a natural person and a United States Citizen.

2.      Defendant Spirit Airlines, Incorporated ("**Defendant**" or "**Spirit Airlines**"), is a foreign business corporation incorporated under the laws of Delaware.

3.      Defendant Spirit Airlines has significant and substantial business contacts throughout New York City, and specifically in Queens County through its physical airline operations based out of LaGuardia airport.

## JURISDICTION AND VENUE

4.      Jurisdiction is founded upon 28 U.S.C. § 1331 as this action contains federal questions in the form of "Title VII" claims.

5.      Venue is proper in the Eastern District of New York under 28 U.S.C. § 1391(b)(1), in that Spirit Airlines resides in Queens county.  Spirit Airlines resides in Queens county because

Spirit Airlines is subject to the court's personal jurisdiction, and it conducts substantial business operations—at all relevant times and presently—in Queens county.

6.     In June 2020 the Equal Employment Opportunity Commission ("**EEOC**") issued to Johnson a *Right to Sue Letter*[1] providing a ninety (90) day time period for *Charging Party* Johnson to file his Title VII claim(s) in court.  (**EXHIBIT A**).

## STATEMENT OF FACTS COMMON TO ALL CLAIMS

7.     Johnson dreamed of working in the airline industry as a flight attendant where he would be able to utilize his people-friendly and attention-to-detail skills, while also earning a comfortable financial living and visiting cities around the nation—and sometimes around the world.

8.     In or around February 2019, Johnson voluntarily quit his stable employment with the Walt Disney Company in order to begin flight attendant training with Spirit Airlines.

### *Johnson Arrives and Gallen's Sexual Predation Begins*

9.     On or around April 24, 2019, Johnson arrived at the Springhill Suites in Dana Beach for his Spirit Airlines training program that would take place in nearby Fort Lauderdale, Florida.

10.     GRINDR is a social messaging application that caters to the LGBTQ+ community and permits users to connect with other users.

11.     GRINDR is an application that users can employ to keep up with friends, find dates or life-long partners, simply pass the time with conversation, or find and coordinate an intimate encounter.

---

[1] Curiously, the "date" issued field was left blank by the EEOC.  On July 14, 2020, the undersigned contacted the EEOC district office, and their files did not list a date-certain, but the EEOC confirmed that letter was mailed in early June 2020.  In any event, Johnson will swear under oath that he received the letter in early June 2020.  Accordingly, even assuming a June 1, 2020 receipt date, this lawsuit is timely and filed three to four weeks in advance of even the earliest potential deadline for the ninety (90) day filing window.

12.     On or around April 24, 2019, fresh in a new city and alone in his hotel room, Johnson launched the GRINDR application to pass the time and possibly make a new friend in his new city.

13.     Minutes after Johnson launched the GRINDR application, a fellow GRINDR user messaged Johnson.  Unbeknownst to Johnson, this particular user was G. Gallen (a Caucasian male) who would serve as his supervisor and instructor during the entire flight attendant training program.

14.     Immediately, Gallen knows Johnson is a new trainee he will have supervisory authority over and Gallen begins his predatory grooming of Johnson: leveraging his workplace power in exchange for sex.

15.     Gallen knew Johnson was a trainee when he wrote: "I'll be seeing you around 😊…you'll see tomorrow…I should tell you now but then I fear we wouldn't talk anymore."

16.     Johnson is still not aware that Gallen is his training instructor, and innocently messages: "Whyyy?" (*sic*).

17.     Gallen then reveals the truth he knew all-along: "Haha well let's just say….I may be one of your instructors…." (*ellipses in original*).

18.     Johnson immediately wished the conversation had never occurred since he realized it was inappropriate for employees and supervisors to mix work and pleasure.  However, Johnson did not want to offend Gallen as Johnson perceived that Gallen could—and perhaps would— jeopardize Johnson's standing as a trainee.

19.     Without missing a beat, Supervisor Gallen continued with his predatory behavior by writing: "You [Johnson] can just f**k me 😊" (*asterisks not in original*).

20.     Johnson felt sick at his stomach when he read this, but not wanting to offend Gallen and to not jeopardize his job Johnson acquiesced somewhat and texted: "Trust.  I will." When Johnson texted that message he never had any intention of having sex with Gallen in any shape or form.  There were two independent and sufficient reasons for Johnson not wanting sex with Gallen:

first, Johnson did not like the pictures Gallen sent nor Gallen's high-pressure tactics, and second, Johnson thought it a recipe-for-disaster to mix work and pleasure.

21.     As a supervisor, Gallen held the cards, and Gallen would not stop when Gallen texted that he desired Johnson's sexual fluids, and that he wanted those sexual fluids so he could perform his instructor duties at Spirit Airlines with Johnson's fluids.

22.     Gallen also texted how easy it was to "release" a trainee for any reason (even none).

23.     Gallen then texted: "Wyd [What are you doing] later" (*sic*).

24.     Trying to gently rebuff Gallen, Johnson attempted to redirect Gallen's attention to to the training program and Johnson's need to care for himself by replying: "Studying and then sleeping.  I've been up for nearly 30 hours."

25.     Sexual predation does not relent, so Gallen then attempts to lure Johnson to dinner at Outback Steakhouse where he promises Johnson a ribeye steak.

26.     Alone in a hotel room, in a new city, hungry, and low on cash, Johnson reluctantly agrees since it would be a public encounter.

### *The Dinner Where Gallen Threatened to Terminate Johnson*

27.     At Outback Gallen kept telling stories about the power and authority instructors (such as himself) have over trainees with respect to "releasing" them from the training program for any reason.  In other words, Gallen was setting Johnson up for a *quid-pro-quo* proposition. Gallen's sexual predation was to set the stakes, that is to say, that if things do not go Gallen's way then Johnson could be released.

28.     Towards the end of dinner, Gallen asked Johnson if he had all the required items for training.  Gallen asked this knowing that almost no new flight attendant arrives with *every* necessary item and also asked this while knowing that the trainees first day at work is when a person needing a required item is provided that item or instructed to acquire it.  Indeed, Gallen hours earlier had texted: "we do paperwork the first day silly."

29.     But Gallen had more than steak and airline equipment on his mind.  After quizzing Johnson on items (most of which Johnson, in fact, had, and the ones he did not he lied and said he

4

did, so as to preclude Gallen from having an excuse to go to the residence), Gallen came up with a new lie to lure Johnson to his residence.  Gallen stated, in substantial form: "how big is the flashlight[2] you say you have?"  This was a perfect rouse since no matter the actual size of the flashlight, Gallen could say it was too big—or too small—and therefore Johnson was in a 'heads I win, tails you lose" situation orchestrated by Gallen's sexual predation.

30.     Johnson pulled up an online picture of the flashlight he had purchased on his phone, and Gallen said, in substantial form: "that flashlight is too large, you'll need a smaller one.  I have one, we can go to my place and I'll give it to you."

31.     Johnson declined, and said that he was sleepy and could just get it from Gallen or the company tomorrow during the first day of training.

32.     Gallen said Johnson's idea was unacceptable and could jeopardize his job.

33.     Johnson did not want to go to Gallen's residence, but Johnson never could have imagined what would befall him.

34.     Still, even with stories of supervisors "releasing" trainees swirling in his head, Johnson *still* demurred and said it would be better to handle it tomorrow.  And declined Gallen's suggestion to go to Gallen's residence.

### *The Kidnapping and Assault*

35.     Minutes later, once in Gallen's car (Johnson did not have a vehicle yet), Gallen drove past Springhill Suites and told Johnson they were going to Gallen's residence.

36.     Johnson's heart raced and he became visibly nervous, but Johnson was literally trapped in a moving vehicle being driven by his new supervisor Gallen.

37.     At Gallen's residence, Johnson was relieved when Gallen returned from his bedroom with a bag and a flashlight—just like Gallen had said he would provide.

38.     For a split second, Johnson thought he had overreacted, misjudged Gallen, and felt a wave of relief.

---

[2] "Flashlight" is NOT a euphemism.  The two were literally talking about a flashlight.

39.     Then everything changed: Gallen handed Johnson the bag and flashlight and said: "they're all yours, but first."  Gallen then started *sexual assault one*.

40.     Johnson was terrified and froze.  After a few minutes Gallen then began *sexual assault two*.

41.     After the assaults, Johnson wanted to report the situation to Spirit Airlines, but, *inter alia*, was afraid that such a report would jeopardize his job.

### Gallen's Workplace Sexual Harassment of Johnson Continues

42.     Gallen continued sexually harassing Johnson through text messages and in-person at Spirit Airlines' training campus.  Specifically, Gallen kept requesting intercourse with Johnson and threatening work "release" from Spirit if Gallen's requests were not met.

43.     Johnson did not acquiesce, and rejected these *quid pro quo* propositions.

44.     On or around April 29, 2019, a fellow Spirit Airlines trainee reported sexual harassment at the hands of another trainee, and Gallen shared the confidential report with Johnson. Gallen mocked and laughed at the report, and this confirmed to Johnson that if he reported Gallen's behavior toward him that he would be ridiculed and potentially lose his job.

45.     As the weeks went by, and Johnson became less-responsive to Gallen, Johnson would receive strange and unsolicited text messages and messages on GRINDR from unknown users.  Upon information and belief, these messages were from Gallen and were an attempt to harass Johnson and to surmise information as to Johnson's where-abouts.

46.     On or around May 14, 2020, J. Presley—a fellow trainee—was absent from class. Just after class began Presley entered the classroom and announced to everyone that he was being "released" because he refused to have sex with Gallen.

47.     Manager Paulita entered the classroom shortly thereafter—after Presley had been escorted off the premises—and informed the entire class that: (a) Spirit Airlines is aware of Presley's complaint, (b) Spirit Airlines will *not* launch an investigation into the matter, (c) Presley is "crazy," and (d) she instructed everyone there to write a statement about any "weird" and negative interactions they had with Presley.

48.     Spirit Airlines treatment of Presley's complaint of *quid-pro-quo* sexual harassment further confirmed to Johnson that complaints of sexual harassment would not be taken seriously and would jeopardize a person's job to the point of termination.

49.     Gallen then revealed confidential information to Johnson about Presley's threat of litigation against Spirit Airlines.  Gallen acted as if Spirit would simply pay-off Presley, and only expressed concern that the case was "complicated" by the fact that a fellow trainee had written a report that said she saw no reason for Presley's "release."

### *Johnson Risks Certification to Report Gallen's Sexual Predation*

50.     On or around May 22, 2019, Johnson graduated from Spirit's training program, however, before he was fully certified he had to pass a real-life Operational Flight Exam ("OFE") where instructors evaluate the trainees in real-life scenarios.

51.     Johnson knew Gallen might have sway over the OFE instructors, who could fail him, but bolstered by his technical graduation days earlier, on or around May 25, 2019 Johnson wrote a detailed complaint of sexual harassment, discrimination and retaliation and sent it via email to Paulita Persaud (the leader in charge of training flight attendants) and Melanie Brown (the leader in charge of all training at Spirit Airlines).

52.     Johnson did not receive a response, so on or around May 26, 2019, Johnson sent a follow-up email to Paulita Persaud and Melanie Brown.

53.     Ms. Persaud and Ms. Brown did not respond to Johnson's complaint of sexual harassment.

### *Despite Spirit's Brush-Off, Johnson Escalates His Report of Gallen's Sexual Predation*

54.     Two months later, in or around early August 2019, a fellow coworker told Johnson that rumor-had-it that Gallen was forced to resign from a prior airline because of credible accusations that Gallen drugged and raped incapacitated male coworkers.

55.     Johnson---aware of Gallen's interactions with him, aware of Presley's allegation, and now aware of the rumor of Gallen drugging and raping other male coworkers—knew he had

to continue to climb the chain-of-command to get a response to his complaints of discrimination against Gallen.

56.     On or around August 12, 2019, Johnson reached out to Laurie Villa (Senior Vice President of Human Resources), who listened to Johnson for over and hour and then directed Johnson to Emilio Pizzini, who worked in the investigations department of Spirit Airlines.

57.     Johnson provided Pizzini information verbally, and documentary emails, texts and pictures.

58.     The next day Pizzini informed Johnson that Gallen was terminated, but would not provide a reason for the termination.

### *Johnson's Breakdown and Spirit's Constructive Discharge*

59.     Since the incident, Johnson has suffered severe depression and anxiety that has physically and emotionally prevented him from serving as a flight attendant or functioning properly in any capacity of his professional or personal life.

60.     Johnson has sought, undergone, and continues to undergo medical and psychiatric treatment because of this situation.

61.     On multiple occasions Johnson informed Spirit Airlines of this fact, but Spirit Airlines retaliated against Johnson and refused any kind of meaningful accommodation or work-around.  Indeed, in late 2019 Spirit Airlines began to "employ" Johnson to prevent him from accessing unemployment insurance benefits, but refused to actually pay his salary—rendering him without any income and, against public policy, severing his access to the safety net of U.I.

62.     By creating, fostering, encouraging, and actively supporting the circumstances that led to Johnson's sexual assaults, sexual harassment, and retaliatory animus, Spirit Airlines has pressed Johnson to a mental breaking point that no person could be expected to endure, and has therefore constructively discharged Johnson.  As the esteemed Justice O'Connor wrote for a unanimous court decades ago: "Title VII comes into play before the harassing conduct leads to a nervous breakdown."  We have well-passed that mark here.

### FIRST CLAIM
(Title VII – Status-based Sex Discrimination)

63.     Plaintiff incorporates by reference the preceding paragraphs as if fully stated herein.

64.     This claim is against the named-Defendant in the caption, above.

65.     All conditions precedent to this lawsuit have been fulfilled.

66.     Johnson interposes all theories of liability, including, but not limited to: hostile work environment, disparate treatment, sexual harassment, and *quid pro quo* discrimination.

67.     Upon information and belief, Defendant's actions were done intentionally or with reckless indifference to Plaintiff's statutorily protected Title VII rights.

68.     As a direct and proximate result of the intentional and/or reckless Defendant's actions, Plaintiff suffered loss of employment, constructive termination, lost wages, monetary damages, loss of seniority, lost benefits, severe emotional distress, medical expenses, psychiatric expenses, the incursion of attorneys' fees, court costs, and other damages.

### SECOND CLAIM
(Title VII - Retaliation)

69.     All preceding paragraphs are incorporated by reference as if fully stated herein.

70.     This claim is against the named-Defendant in the caption, above.

71.     Plaintiff interposes all theories of liability that can prove this claim, including, but not limited to: retaliation, and anticipatory retaliation.

72.     Without belaboring the point, and without summarizing all adverse and retaliatory acts Spirit took against Johnson, it should suffice for pleading purposes to state Spirit retaliated when: (a)[3] Manager Paulita Persaud burst into the trainee room, minutes after receiving a credible sexual harassment complaint from Presley, and showed the trainees how Spirit would deal with complaints by closing ranks, labeling the complainant as "crazy," marshaling "weird" statements

---

[3] This was before Johnson voiced his complaint(s).  Therefore, this is a form of anticipatory retaliation because Spirit likely knew of or suspected other victims, and was sending a signal to trainee victims: to shut up or get fired.

against the complainant, and affirming the termination of a complainant; (b)[4] Gallen, twice, showed Johnson two complaints of discrimination by third-parties and Gallen mocked both complaints; (c) Gallen threatened to "release" Johnson after Johnson rejected Gallen's sexual advances throughout the training program; (d) Manager Paulita Persaud and Manager Melanie Brown ignored Johnson's May 25, 2019 complaint of sexual harassment, and permitted the credibly-accused Gallen access to Johnson and where, in fact, Gallen actually stalked and waited for Johnson on numerous occasions at work after that date; and, (e) Spirit Airlines refused to accommodate Johnson's physical and mental condition caused by the sexual harassment, and instead "employed" him to block UI and yet refused to actually pay his salary starting in or around September 2019. This list is not exhaustive, and Johnson possesses further information and facts establishing retaliatory acts by Spirit Airlines.

73.    Johnson is entitled to punitive damages because not only does Spirit Airlines know it might be violating Title VII, but Spirit Airlines has actively engaged in sham-investigations, cover-ups, and knowingly wrongful terminations. This level of contumacious behavior should not be countenanced by this Court, and punitive damages should be awarded against Spirit to, *inter alia*, send a signal to companies that Title VII is real, and attempts to illegally circumvent its mandates will not be tolerated in 2020.

74.    As a direct and proximate result of the intentional and/or reckless Defendant's actions, Plaintiff suffered loss of employment, constructive termination, lost wages, monetary damages, loss of seniority, lost benefits, severe emotional distress, medical expenses, psychiatric expenses, the incursion of attorneys' fees, court costs, and other damages.

---

[4] This was before Johnson voiced his complaint(s). Therefore, this is a form of anticipatory retaliation because Gallen knew Johnson had grievances against him, and Gallen was attempting to dissuade Johnson from coming forward. That chilling pressure constitutes an adverse employment action sufficient, in and of itself, to sustain a claim of retaliation. Indeed, if Gallen's anticipatory retaliation in the form of intimidation had worked, as planned, then Gallen would likely still be employed and sexually assaulting male subordinates.

## PRAYER FOR RELIEF

**WHEREFORE**, Johnson *respectfully* requests judgment against the above-named defendant as follows:

A.      An award of damages against Defendant in an amount to be determined at trial, plus interest, to compensate Plaintiff for all monetary and/or economic damages, including, without limitation, loss of past and future income, wages (including gratuities), compensation, loss of seniority, and other benefits of employment;

B.      An award of damages against Defendant in an amount to be determined at trial, plus interest, to compensate for all *non*-monetary and/or compensatory damages, including, without limitation, compensation for Plaintiff's severe mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering, and emotional distress;

C.      An award of punitive damages against Defendant in an amount to be determined at trial;

D.      Prejudgment interest on all amounts due;

E.      An award of costs that Plaintiff has incurred in this action, including, without limitation and as applicable, expert witness fees, if any, as well as Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and,

F.      Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby *respectfully* demands a trial by jury on all issues that can be considered, determined, and/or resolved by a jury.

**Dated:** New York, New York
              11 August 2020

                         **Respectfully submitted,**

                         By:     /s/ Jeffrey D. Jones
                                 Jeffrey D. Jones, *Esq*.

11

NY Bar #4843363
**THE JONES LAW FIRM**
523 East Pine Place
Tulsa, OK 74106-4301
(574) 876-4715
jj@jeffreyjoneslawfirm.com

*Attorney for Plaintiff Johnson*